# B



**Sterne Kessler**
**Goldstein Fox**
ATTORNEYS AT LAW

July 5, 2005

*WRITER'S DIRECT NUMBER:*
(202) 772-8653
*INTERNET ADDRESS:*
room@skgf.com

Chief Executive Officer
**Shire Laboratories, Inc.**
1550 East Gude Drive
Rockville, MD 20850

*Certified Mail - Return Receipt*

Re:    Notification Pursuant to § 505(j)(2)(B)(iv)
       of the Federal Food, Drug, and Cosmetic Act

Dear Sir:

We represent BARR LABORATORIES, INC. ("BARR") of Pomona, New York. We are writing on behalf of our client to provide notice of the following information to SHIRE LABORATORIES, INC. ("SHIRE"), the owner of U.S. Patent No. 6,913,768 according to the records of the U.S. Patent and Trademark Office, and the approval holder of New Drug Application ("NDA") No. 21-303 according to the records of the U.S. Food and Drug Administration ("FDA"):

I.

Pursuant to 21 U.S.C. § 355(j)(2)(B)(ii) and 21 C.F.R. § 314.95(c)(1), we advise you that the FDA has received an Abbreviated New Drug Application ("ANDA") from BARR containing bioavailability and/or bioequivalence data from studies on the amphetamine salt oral drug product that is the subject of NDA No. 21-303. The ANDA was submitted under § 505(j) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 355(j)(1) and (2)(A) and was amended to include a paragraph IV certification to the '768 patent to obtain approval to engage in the commercial manufacture, use or sale of an amphetamine salt product before the expiration of the above-mentioned patent, which is listed in *Approved Drug Products with Therapeutic Equivalence Evaluation* ("Orange Book").

II.

Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that the ANDA submitted by BARR has been assigned the number 76-536 by the FDA.

Chief Executive Officer
July 5, 2005
Page 2

III.

      Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established name of the drug product that is the subject of BARR's ANDA is dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate and amphetamine sulfate extended-release capsules, 5 mg, 10 mg, 15 mg, 20 mg, 25 mg and 30 mg (mixed salts).

IV.

      Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active ingredient in the proposed drug product is a mixture of four amphetamine salts: dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate and amphetamine sulfate; the strengths of the proposed drug products are 5 mg, 10 mg, 15 mg, 20 mg, 25 mg and 30 mg; and the dosage form of the proposed drug product is a capsule.

V.

      Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patent alleged to be not infringed, invalid and/or unenforceable in the paragraph IV certification is U.S. Patent No. 6,913,768 ("the '768 patent"), which has a listed expiration date of May 24, 2023.

VI.

      BARR alleges, and has certified to the FDA, that in BARR's opinion and to the best of its knowledge the above-listed patent is invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use or sale of the drug product described in BARR's ANDA. Therefore, pursuant to 21 U.S.C. § 355(j)(2)(B)(ii) and 21 C.F.R. § 314.95(c)(6), BARR's detailed statement of the legal and factual basis for the certification set forth in BARR's ANDA is attached hereto as an appendix and is made part hereof.

VII.

      Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III), BARR offers to provide confidential access to certain information from its ANDA No. 77-251 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

      Section 355(j)(5)(C)(i)(III) allows BARR to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." That provision also grants BARR the right to redact its ANDA in response to a request for Confidential Access under this offer.

      As permitted by statute, BARR imposes the following terms and restrictions on its Offer of Confidential Access:

Chief Executive Officer
July 5, 2005
Page 3

(1)     BARR will permit confidential access to certain information from its proprietary
        ANDA No. 76-536 to attorneys from one outside law firm representing SHIRE;
        provided, however, that such attorneys do not engage, formally or informally, in
        patent prosecution for SHIRE. Such information (hereinafter, "Confidential BARR
        Information") shall be marked with the legend "CONFIDENTIAL".

(2)     The attorneys from the outside law firm representing SHIRE shall not disclose any
        Confidential BARR Information to any other person or entity, including SHIRE
        employees, outside scientific consultants, and/or other outside counsel retained by
        SHIRE, without the prior written consent of BARR's outside litigation counsel,
        Winston & Strawn LLP.

(3)     As provided by § 355(j)(5)(C)(i)(III), SHIRE's outside law firm shall make use of
        the Confidential BARR Information for the sole and exclusive purpose of
        determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and
        for no other purpose. By way of example only, the Confidential BARR
        Information shall not be used to prepare or prosecute any future or pending patent
        application by SHIRE, or in connection with any filing to or communication with
        the FDA relating to BARR's ANDA No. 76-536. SHIRE's outside law firm agrees
        to take all measures necessary to prevent unauthorized disclosure or use of the
        Confidential BARR Information, and that all Confidential BARR Information shall
        be kept confidential and not disclosed in any manner inconsistent with this Offer
        of Confidential Access.

(4)     The Confidential BARR Information disclosed is, and remains, the property of
        BARR. By providing the Confidential BARR Information, BARR does not grant
        SHIRE and/or SHIRE's outside law firm any interest in or license for the
        Confidential BARR Information.

(5)     SHIRE's law firm shall, within thirty-five (35) days from the date that it first
        receives the Confidential BARR Information, return to BARR's outside litigation
        counsel, Winston & Strawn LLP, all Confidential BARR Information and any
        copies thereof. SHIRE's law firm shall return to Winston & Strawn LLP all
        Confidential BARR Information before any infringement suit is filed by SHIRE, if
        suit is commenced before this 35-day period expires. In the event that SHIRE opts
        to file suit, none of the information contained in or obtained from any
        Confidential BARR Information that BARR provides will be included in any
        publicly-available complaint or other pleading.

(6)     Nothing in this Offer of Confidential Access shall be construed as an admission
        by BARR regarding the validity, enforceability, and/or infringement of any U.S.
        Patent. Further, nothing herein shall be construed as an agreement or admission

Chief Executive Officer
July 5, 2005
Page 4

by BARR with respect to the competency, relevance, or materiality of any such
Confidential BARR Information, document, or thing. The fact that BARR provides
Confidential BARR Information upon request of SHIRE shall not be construed as an
admission by BARR that such Confidential BARR Information is relevant to the
disposition of any issue relating to any alleged infringement of the '768 patent.

(7)     The attorneys from SHIRE's outside law firm will acknowledge in writing their
        receipt of a copy of these terms and restrictions prior to production of any
        Confidential BARR Information.     Such written acknowledgement shall be
        provided to BARR's outside litigation counsel, Winston & Strawn LLP.

(8)     This Offer of Confidential Access shall be governed by the laws of the State of
        Delaware.

Section 355(j)(5)(C)(i)(III) provides that any request for access that SHIRE makes under
this Offer of Confidential Access "shall be considered acceptance of the offer of confidential
access with the restrictions as to persons entitled to access, and on the use and disposition of any
information accessed, contained in [this] offer of confidential access" and that the "restrictions
and other terms of [this] offer of confidential access shall be considered terms of an enforceable
contract." Thus, to the extent that SHIRE requests access to Confidential BARR Information, it
necessarily accepts the terms and restrictions outlined above.  Written notice requesting access
under this Offer of Confidential Access should be made to:

                        John Mooney
                        WINSTON & STRAWN LLP
                        35 West Wacker Dr.
                        Chicago, IL 60601
                        Tel: (312) 558-5600
                        Fax: (312) 558-5700

Chief Executive Officer
July 5, 2005
Page 5

By providing this Offer of Confidential Access to Application, BARR maintains the right and
ability to bring a Declaratory Judgment action under 28 U.S.C. §§ 2201 *et seq.*, pursuant to 21
U.S.C. § 355(j)(5)(C).

Very truly yours,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Robert C. Millonig

Enclosure

*Detailed Factual and Legal Basis for BARR's ANDA*
*Certification that U.S. Patent No. 6,913,768 is*
*Invalid, Unenforceable and/or Will Not Be Infringed*

**I.    Introduction**

This document is the detailed factual and legal basis for the assertion of Barr Laboratories, Inc. ("BARR") that, in its opinion, and to the best of its knowledge, U.S. Patent No. 6,913,768 ("the '768 patent") is invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use or sale of the drug product described in BARR's ANDA. The right to raise additional defenses is specifically reserved. This includes defenses that may be developed from the discovery that Shire has produced in the *Shire v. Barr* litigation, but designated as "confidential" which arguably precludes its review and use in connection with the preparation of Barr's detailed statement.

**II.    Background Information**

**A.    ADDERALL XR®**

The active ingredients in the drug product ADDERALL XR® are dextroamphetamine sulfate, dextroamphetamine saccharate, amphetamine sulfate and amphetamine aspartate. ADDERALL XR® is approved for the treatment of Attention Deficit Hyperactivity Disorder ("ADHD"). It is supplied as a capsule for oral administration containing 5, 10, 15, 20, 25 or 30 mg of the amphetamine salt mixture, together with various inactive ingredients.

**B.    The ANDA Formulation**

The product that is the subject of BARR's ANDA ("BARR's ANDA product") is a capsule. Each capsule contains two different types of pellets: immediate release and enteric release. The enteric release pellets contain a pH-dependent release coating over the amphetamine salts. BARR's ANDA product also includes various inactive ingredients. In pending litigation, BARR has produced a complete copy of its ANDA and all amendments thereto under the terms of a stipulated protective order.

**III.    Factual and Legal Basis for BARR'S Certification**

As discussed below, claims 1-37 of the '768 patent are not infringed by BARR's ANDA product, either literally or under the doctrine of equivalents. Alternatively, these claims are invalid for at least the reasons set forth below.

**A.    The '768 Patent**

The '768 patent issued with 37 claims, of which claims 1, 7, 9, 11-15, and 35 are independent.[1]    (The '768 patent, col. 13, line 49 to col. 18, line 7.) The claims of the '768 patent

---

[1] Claim 16 as issued in the '768 patent recites that it depends from claims 1, 16, 17, 18, 21, 31 or 32. However, it is evident from context that the recited claim dependencies were not renumbered as they

1

are generally directed to a pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix comprising a particular sustained release agent and methods of treatment using the composition.

Claims 1-12 and multiply dependent claims 16-34, as they depend therefrom, require that the sustained release coating or matrix comprising a particular sustained release agent "effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide" a particular mean plasma concentration profile. Claim 13 of the '768 patent requires a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve sustained continuous release of said amphetamine and/or salt(s) to provide" a particular mean plasma concentration profile. Claims 35-37 of the '768 patent require a sustained release coating comprising "an amount of ethyl cellulose, effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide" a particular mean plasma concentration profile. Neither "continuous sustained release" nor "sustained continuous release" is mentioned in the specification.

Claim 15 and dependent claims 16-34 of the '768 patent require a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve a single sustained dissolution release of said amphetamines and/or salt(s), which has" particular AUC and $C_{max}$ values.

Claim 14 and dependent claims 16-34 of the '768 patent require a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve about a first order sustained dissolution release of said amphetamines and/or salt(s), which has" particular AUC and $C_{max}$ values.

The '768 patent states that the formulations of the invention

> are preferably formulated to provide an in vivo plasma concentration profile (i.e., measured by total concentration of the amphetamines and/or amphetamine salts (often with separate tracking of d-and l-isomers) in the patients' blood plasma) which is substantially equivalent to the in vivo plasma concentration profile achieved by pulsatile release formulations of the same amphetamines and/or amphetamine salts when administered to a patient, e.g., those achieved by ADDERALL XR®, Shire US Inc., whose FDA package insert and labeling are entirely incorporated by reference herein. Further preferably, this sustained release profile (the plasma concentration profile being distinguished from

should have been upon issuance. Only the dependency to claim 1 was properly renumbered. Claim 16 as issued corresponds to what was previously numbered as allowed claim 12. *See* prosecution history of the '768 patent. According to the Issue Classification information from the prosecution history of the '768 patent, claims 6, 16, 17, 18, 21, 31 and 32 were renumbered as claims 1, 7, 9, 11, 12, 14 and 15, respectively. Therefore, claim 16 is addressed under the assumption that it depends from claims 1, 7, 9, 11, 12, 14, or 15.

2

the release profile) typically exhibits first order or biphasic or sigmoidal characteristics.

(The '768 patent, col. 1, lines 15-28)

With regard to the plasma concentration profile, the '768 patent states that

the SR formulations according to the invention exhibit a single dose in vivo plasma concentration profile substantially the same as that shown in FIG. 1. The latter shows the substantially smooth mean (over about 20 patients) plasma concentration curves achieved for both the dextroamphetamine and levoamphetamine salts in ADDERALL XR®. (The overall mean plasma concentration curve for total amphetamine level is simply the sum of the two curves shown in FIG. 1). Because the formulations of this invention achieve substantially the same mean plasma concentration curves, they can be termed fast sustained release formulations, with regard to the initial rising slopes involved.

(The '768 patent, col. 1, lines 29-41.)

The '768 patent further states that

[s]uitable sustained-release systems, include SR coatings, e.g., on beads, SR matrices (i.e., no coatings needed), SR osmotic systems, etc. whereby amphetamine salts achieve a first order, biphasic, sigmoidal etc. release profile to achieve the plasma profile equivalent of pulsatile release systems of the same drugs as discussed above. Matching to the desired target plasma concentration profile using SR is conventional.

(The '768 patent, col. 2, line 64 to col. 3, line 4.)

According to the '768 patent, "there can be included in the formulation, along with the layered beads or matrix beads, immediate release formulations which provide one way to achieve a desired initial fast release. Such immediate release formulations are fully conventional. *See e.g.*, WO 00/23055." (The '768 patent, col. 3, lines 58-63.)

**B.    *Claims 1-37 Are Not Infringed by the Manufacture, Use, Sale, and/or Offer for Sale of BARR's ANDA product***

**1.    *No Literal Infringement***

For at least the reasons discussed below, the commercial manufacture, use, sale or offer for sale of BARR's ANDA product will not directly or indirectly infringe any claim of the '768 patent, either literally or under the doctrine of equivalents.

3

Each of claims 1-13 and multiply dependent claims 16-34[2] of the '768 patent requires a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve continuous sustained release [or "sustained continuous release" in claim 13] of said amphetamines and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients" with recited values. BARR's ANDA product does not contain an amount of the particular sustained release agents "effective to achieve continuous sustained release of said amphetamines and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients" with the recited values. Consequently, BARR's ANDA product does not contain all of the limitations of claims 1-13 and 16-34. Thus, the commercial manufacture, use, sale and/or offer for sale of BARR's ANDA product will not literally infringe claims 1-13 or 16-34 of the '768 patent.

Claim 14 and multiply dependent claims 16-34 of the '768 patent require a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve about a first order sustained dissolution release of said amphetamines and/or salt(s), which has [particular AUC and $C_{max}$ values]." BARR's ANDA product does not contain an amount of the particular sustained release agents "effective to achieve about a first order sustained dissolution release of said amphetamines and/or salt(s), which has" the recited AUC and $C_{max}$ values. Consequently, BARR's ANDA product does not contain all of the limitations of claims 14 and multiply dependent claims 16-34. Thus, the commercial manufacture, use, sale and/or offer for sale of BARR's ANDA product will not literally infringe claims 14 and multiply dependent claims 16-34 of the '768 patent.

Claim 15 and multiply dependent claims 16-34 of the '768 patent require a sustained release coating or matrix comprising a particular sustained release agent which is "effective to achieve a single sustained dissolution release of said amphetamines and/or salt(s), which has" particular AUC and $C_{max}$ values. BARR's ANDA product does not contain an amount of the particular sustained release agents "effective to achieve a single sustained dissolution release of said amphetamines and/or salt(s), which has" the recited AUC and $C_{max}$ values. Consequently, BARR's ANDA product does not contain all of the limitations of claims 15 and multiply dependent claims 16-34. Thus, the commercial manufacture, use, sale and/or offer for sale of BARR's ANDA product will not literally infringe claims 15 and multiply dependent claims 16-34 of the '768 patent.

Claims 35-37 of the '768 patent require a sustained release coating comprising "an amount of ethyl cellulose, effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients" which has particular AUC and $C_{max}$ values. BARR's ANDA product does not contain "an amount of ethyl cellulose, effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients" with the recited AUC and $C_{max}$ values. Consequently, BARR's ANDA product does not contain all of the limitations of claims 35-37. Thus, the commercial manufacture, use, sale and/or offer for sale of BARR's ANDA product will not literally infringe claims 35-37 of the '768 patent.

---

[2] To the extent they depend from claims 1-13.

4

### 2.    No Infringement Under the Doctrine of Equivalents

BARR's ANDA product does not infringe any of claims 1-37 of the '768 patent under the doctrine of equivalents because BARR's ANDA product achieves its plasma concentration profile in a substantially different way than recited in the claims. In particular, BARR's ANDA product does not contain an amount of a sustained release agent that is effective to achieve the parameters recited in the claims. Rather, BARR's ANDA product uses a 50:50 mixture of immediate and delayed release components to achieve its plasma concentration profiles. Thus, BARR's ANDA product does not achieve the same result as the claimed invention in substantially the same way as the claimed invention. Consequently, BARR's ANDA product does not infringe any claim of the '768 patent under the doctrine of equivalents.

Furthermore, the patentee narrowed the claims of the '768 patent during prosecution for substantial reasons related to patentability. Namely, in response to the Examiner's rejections over the prior art (including International Pat. Appl. Publ. No. WO 00/23055), the amended and newly added claims were narrowed from the originally filed claims to recite the limitation "effective to achieve [continuous sustained release, sustained continuous release, about a first order dissolution release, or a single sustained dissolution release]" and to recite a list of specific sustained release agents.

The patentee cannot rebut the presumption that all subject matter between the original, broader claim, and the amended claims has been surrendered because: 1) any equivalents between patentee's original and amended claims would have been foreseeable at the time of the narrowing amendment; 2) the reason for making the narrowing amendment bears more than a tangential relation to the equivalent in question because the amendment was made to avoid the prior art; and 3) there is no other reason that the patentee could not reasonably be expected to have described the equivalent in question because the equivalent is in the prior art.

Because equivalents are unavailable to the patentee with respect to this element and BARR's ANDA product is outside the literal scope of the claims of the '768 patent, BARR's ANDA product cannot infringe these claims under the doctrine of equivalents.

### C.    Claims 1-37 are Obvious Under 35 U.S.C. § 103(a)

In the alternative, to the extent that Shire construes the "continuous" limitation of the claims '768 patent as covering BARR's ANDA product, claims 1-37 of the '768 patent are invalid under 35 U.S.C. §103(a).

The International Publication No. WO 00/23055 was published on April 27, 2000 and qualifies as prior art to the claims of the '768 patent under 35 U.S.C. § 102(b). WO 00/23055 describes formulations containing pharmaceutically active amphetamine salts, which include "one or more pharmaceutically active amphetamine salts that are covered with an immediate release coating, and . . . one or more pharmaceutically active amphetamine salts that are covered with an enteric release coating." WO 00/23055, p. 5. Furthermore, Example 4, on page 18, of WO 00/23055 provides a pharmaceutical composition comprising a mixture of amphetamine salts with an 8% coating of SURELEASE (ethyl cellulose).

5

WO 00/23055 also includes a target plasma concentration profile for the formulations at Figure 1, and two other plasma concentration profiles at Figures 7 and 8. According to WO 00/23055, "Figures 7 and 8 show the typical profiles of plasma amphetamine concentration after administration of a composite capsule containing the immediate-release pellets and delayed release pellets from Examples 1 and 2." WO 00/23055, p. 19.

The 1997 PHYSICIAN'S DESK REFERENCE ("1997 PDR"), which contains the labeling for ADDERALL®, was published more than one year before September 24, 2002, the earliest date to which the claims of the '768 patent are entitled to claim priority, and therefore qualifies as prior art to these claims under 35 U.S.C. § 102(b). The 1997 PDR discloses a pharmaceutical formulation for delivery of a four amphetamine salt mixture, ADDERALL®, for use in the treatment of ADHD. Id. at 2209. The 1997 PDR also discloses that this formulation contains equal amounts of dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate, and amphetamine sulfate. Id.

According to the 1997 PDR, each ADDERALL® tablet contains 10 mg of amphetamine salts. Id. Regarding dosing, the 1997 PDR states "[i]n children 6 years of age and older, start with 5 mg once or twice daily; daily dosage may be raised in increments of 5 mg at weekly intervals until optimal response is obtained. Only in rare cases will it be necessary to exceed a total of 40 mg per day." Id. Thus, the 1997 PDR discloses both once and twice-daily administration of ADDERALL®, for a total daily dosage amount of 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, or 40 mg. See id. at 2210. According to the 1997 PDR, when more than one dose is to be administered, the individual doses of ADDERALL® are administered four to six hours apart. Id.

According to the '768 patent, sustained release coatings useful in the '768 patent invention include SURELEASE. '768 patent, col. 4, line 19. The '768 patent includes several examples of sustained release formulations of the invention, including one example with an 8% SURELEASE coating. See '768 patent, Example 3. Thus, according to the '768 patent, an 8% SURELEASE coating has an amount of ethyl cellulose which is effective to achieve the "continuous sustained release" or "sustained continuous release" of the amphetamine salts "to provide a mean plasma concentration profile in human ADHD patients" with the values recited in claims 1-13 and 16-37.

Additionally, according to the '768 patent, an 8% SURELEASE coating has an amount of ethyl cellulose which is "effective to achieve about a first order sustained dissolution release" (as recited in claim 14 and dependent claims 16-34) or "effective to achieve a single sustained dissolution release" (as recited in claim 15 and dependent claims 16-34) of the amphetamines, and which has the recited plasma concentration profile AUC and $C_{max}$ values.

The 1997 PDR describes administration of two 10 mg immediate release doses of ADDERALL®. WO 00/23055 describes formulations that are intended to mimic the plasma concentration profiles of the two immediate release doses. One of those formulations has an 8% SURELEASE ethylcellulose coating that achieves sustained release. The desired plasma concentration profiles are achieved by the administration of the two immediate release doses of ADDERALL® as taught by the 1997 PDR. One of ordinary skill in the art would have been motivated to combine these references because both relate to treatment of ADHD, and because

6

WO 00/23055 was an attempt to achieve the same pharmacokinetics of ADDERALL® but to alleviate the problems associated with multiple administrations of amphetamines.

Thus, at least to the extent Shire construes the "continuous" limitation of the '768 patent as covering BARR's ANDA product, WO 00/23055 in view of the 1997 *PDR* teaches a formulation which falls within the scope of claims 1-37 of the '768 patent. Furthermore, only routine optimization would be required to achieve pharmacokinetic parameters recited by the claims of the '768 patent that are not specifically provided by the references. Accordingly, WO 00/23055 in view of the 1997 *PDR* renders obvious claims 1-37 of the '768 patent and these claims are invalid under 35 U.S.C. § 103(a).

Sterne, Kessler, Goldstein & Fox P.L.L.C.  :  1100 New York Avenue, NW  :  Washington, DC 20005  :  202.371.2600  f 202.371.2540  :  www.skgf.com

# C



30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

July 5, 2005

**CONFIDENTIAL CORRESPONDENCE**
Via Federal Express

Shire Laboratories, Inc.                    Tracking #8482 6214 4653
1550 East Gude Drive
Rockville, Maryland 20850

Anthony Zelano                              Tracking #8482 6214 4664
Millen, White, Zelano & Branigan, P.C.
Arlington Courthouse Plaza 1, Suite 1400
2200 Clarendon Boulevard
Arlington, Virginia 22201

Edgar H. Haug                               Tracking #8482 6214 4675
Frommer Lawrence & Haug, L.L.P.
745 Fifth Avenue
New York, New York 10151

Re:    Notice Under 21 U.S.C. § 355 (j)(2)(B)(i) through (iv)
       With Reference to U.S. Patent No. 6,913,768

Dear Sir or Madam:

This is to advise you, pursuant to 21 U.S.C. § 355 (j)(2)(B)(ii) (II) and as permitted by 21
U.S.C. § 355(j)(2)(D)(ii), that the Food and Drug Administration ("FDA") has received from
IMPAX Laboratories, Inc. ("IMPAX"), a Delaware corporation, with its principal place of
business at 30831 Huntwood Avenue, Hayward, CA 94544, a Patent Amendment to
Dextroamphetamine Saccharate, Amphetamine Aspartate Monohydrate, Dextroamphetamine
Sulfate and Amphetamine Sulfate Extended-Release Capsule (Mixed Salts of a Single-Entity
Amphetamine) ANDA 76-852, providing a Paragraph IV patent certification for U.S. Patent
No. 6,913,768.

In accordance with 21 U.S.C. § 355 (iii), Shire, as the holder of NDA 21-303 for ADDERALL® XR, and as the assignee of U.S. Patent No. 6,913,768, is herewith provided this notice that certification has been made to the U.S. Food and Drug Administration, pursuant to 21 U.S.C. § 355 (j)(2)(A)(vii)(IV), that the aforementioned patent will not be infringed by the manufacture, use, offer for sale, sale or importation of the IMPAX Dextroamphetamine Saccharate, Amphetamine Aspartate Monohydrate, Dextroamphetamine Sulfate and Amphetamine Sulfate Extended-Release Capsules (Mixed Salts of a Single-Entity Amphetamine), 5 mg, 10 mg, 15 mg, 20 mg, 25 mg and 30 mg or that the patent is invalid or unenforceable.

The attached Confidential Appendix provides a detailed statement of the factual and legal bases of IMPAX's opinion that said patents are not valid, or will not be infringed, and/or are unenforceable in accordance with 21 U.S.C. § 355(j)(2)(B)(iv).

In addition, please find enclosed an Offer of Confidential Access pursuant to 21 U.S.C. 355(j)(2)(C)(i)(III).

Sincerely,
IMPAX Laboratories, Inc.

Margaret M. Snowden
Vice-President, Intellectual Property

Enclosures:    Confidential Appendix
               Offer of Confidential Access

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii)), and 21 C.F.R. § 314.95(c), of its factual and legal bases for its opinion that U.S. Patent No. 6,913,768 ("the '768 patent"), is invalid, unenforceable, or not infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax's 5, 10, 15, 20, 25 and 30 mg amphetamine aspartate, amphetamine sulfate, dextroamphetamine saccharate and dextroamphetamine sulfate extended release capsules ("Impax's capsules"), for which this detailed statement is submitted. The bases for Impax's opinion follow.

## I.    The '768 Patent

The '768 patent, entitled *Sustained Release Delivery Of Amphetamine Salts*, issued July 5, 2005, from application S/N 10/353,073 (filed January 29, 2003), which is related to provisional application S/N 60/412,799 (filed September 24, 2002). Assigned on its face to Shire Laboratories, Inc., the '768 patent published as US. Publication No. 2004/0059002 on March 25, 2004, and lists Richard A. Couch, Beth Burnside and Rong-Kun Chang as inventors, and contains thirty-seven (37) claims, of which nine (9) are independent. According to the U.S. PTO Patent Application Information Retrieval database, the '768 patent is entitled to a patent term extension of 115 days, and thus, if valid would expire on May 24, 2023.

> 1. A pharmaceutical composition comprising a mixture of dextro-and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve continuous sustained release of said amphetamines and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which is substantially the same as the dextroamphetamine XR profile and/or the levoamphetamine XR profile of Fig 1 over the course of the first twelve hours after administration, for a 20 mg total dose, or to provide a profile directly proportional to said XR profile(s) for a total dose other than 20 mg.
>
> * * * *
>
> 7. A pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acrylate, microcrystalling cellulose or poly(ethylene oxide) effective to achieve continuous sustained release of said amphetamines and/or salts to provide a mean plasma concentration profile in human ADHD patients which has substantially the same initial slope as the dextroamphetamine XR profile and/or the levoamphetamine XR profile of FIG. 1 from 2 hours to 4 hours after administration, for a 20 mg total dose, or respective initial slope(s) from 2 hours to 4 hours after administration directly proportional to that of said XR profile(s) for a total dose other than 20 mg.
>
> * * * *

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 2

9. A pharmaceutical composition comprising a mixture of dextro-and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve continuous sustained release of said amphetamines and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which has an initial slope from 2 hours to 4 hours after administration of about 3.7 to about 11.4 ng/(mL hr) for dextroamphetamines and/or about 1.4 to about 3 ng/(mL hr) for levoamphetamines, all at a total amphetamine dose of 20 mg, or respective initial slope(s) from 2 hours to 4 hours after administration directly proportional thereto for a total dose other than 20 mg.

* * * *

11. A pharmaceutical composition comprising a mixture of detro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose aetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve continuous sustained release of said amphetamines and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which has an initial slope from 2 hours to 4 hours after administration of about 4 to about 8 ng/(mL hr) for dextroamphetamines and/or about 1.5 to about 2.2 ng/(mL hr) for levoamphetamines, for a 20 mg total dose, or respective initial slope(s) from 2 hours to 4 hours after administration directly proportional thereto for a total dose other than 20 mg.

12. A pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acryltae, microcrystalline cellulose or poly(ethylene oxide) effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which has an AUC of 556.6 mg hr/mL±20% and a $C_{max}$ of 28.0 ng/mL±20% for dextroamphetamine and/or an AUC of 205.1 ng hr/mL±20% and a $C_{max}$ of 8.7 ng/mL±20% for levoamphetamine, for a 20 mg total dose, or respective AUC and $C_{max}$ values directly proportional thereto for a total dose other than 20 mg.

13. A method for treating attention deficit hyperactivity disorder which comprises administering to a human patient in need thereof a pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 3

cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(methacrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve sustained continuous release of said amphetamine and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which has an AUC of 556.6 mg hr/mL±20% and a $C_{max}$ of 28.0 ng/mL±20% for dextroamphetamine and/or an AUC of 205.1 ng hr/mL±20% and a $C_{max}$ of 8.7 ng/mL±20% for levoamphetamine, for a 20 mg total dose, or respective AUC and $C_{max}$ values directly proportional thereto for a total dose other than 20 mg.

14.  A pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose aetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(methacrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve about a first order sustained dissolution release of said amphetamines and/or salt(s), which has an AUC of 556.6 mg hr/mL ± 20% and a $C_{max}$ of 28.0 ng/mL ± 20% for dextroamphetamine and/or an AUC of 205.1 ng hr/mL ± 20% and a $C_{max}$ of 8.7 ng/mL ± 20% for l levoamphetamine, for a 20 mg total dose, or respective AUC and $C_{max}$ values directly proportional thereto for a total dose other than 20 mg.

15.  A pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating or matrix which comprises an amount of polyvinyl acetate, cellulose acetate, cellulose acetate butyrate, cellulose acetate propionate, ethyl cellulose, a fatty acid, a fatty acid ester, an alkyl alcohol, a wax, zein (prolamine from corn), a poly(meth)acrylate, microcrystalline cellulose or poly(ethylene oxide) effective to achieve a single sustained dissolution release of said amphetamines and/or salt(s), which has an AUC of 556.6 mg hr/mL ± 20% and a $C_{max}$ of 28.0 ng/mL. ± 20% for dextroamphetamine and/or an AUC of 205.1 ng hr/mL ± 20% and a $C_{max}$ of 8.7 ng/mL ± 20% for levoamphetamine, for a 20 mg total dose, or respective AUC and $C_{max}$ values directly proportional thereto for a total dose other than 20 mg.

* * * *

35.  A pharmaceutical composition comprising a mixture of dextro- and levo-amphetamine and/or salt(s) thereof and a sustained release coating which comprises an amount of ethyl cellulose effective to achieve continuous sustained release of said amphetamine and/or salt(s) to provide a mean plasma concentration profile in human ADHD patients which has an AUC of 556.6 mg hr/mL ± 20% and a $C_{max}$ of 28.0 ng/mL ± 20 for dextroamphetamine and/or an AUC of 205.1 ng hr/mL ± 20% and a $C_{max}$ of 8.7 ng/mL ± 20% for levoamphetamine, for a 20 mg total dose, or respective AUC and $C_{max}$ values directly proportional thereto for a total dose other than 20 mg.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**

Page 4

The dependent claims further define: the amphetamine mixture (claims 2, 19 and 36); the weight amount of the amphetamine mixture components (claim 3); the core coated with a water-insoluble film former or sustained release polymer (claims 4 and 21); the coating comprises a dissolution regulating agent (claim 5); the sustained release matrix (claims 16-17 and 27-28); the treatment of ADHD with particular compositions (claims 6, 8, 10 and 18); the coating or matrix (claims 20, 24, 29-30 and 37); the dissolution release profile (claim 25); the dissolution profile test (claim 26); the sustained release coating or matrix having a pH independent dissolution release (claims 31-32); the mean plasma concentration profile for levoamphetamine (claim 33); the mean plasma concentration for dextroamphetamine and levoamphetamine (claim 34).

## II.   The Claims Of The '768 Patent Are Invalid Under § 103(a)

While a patent enjoys a statutory presumption of validity, *see* 35 U.S.C. § 282, a claim is invalid if obvious in view of the prior art. A party can overcome this presumption by clear and convincing evidence that in view of the prior art, a person of "ordinary skill in the art" at the time of making the claimed invention would have found it obvious. *Graham v. John Deere Co.*, 383 U.S. 1 (1966), sets forth the criteria to determine the obviousness or unobviousness of a claimed invention – criteria which include factual findings respecting: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations such as a long-felt need for the claimed invention, commercial success of the invention, and failure of others to achieve the invention. *Id.* at 17-18.

### A.    The Level Of Ordinary Skill In The Art

The prior art demonstrates a reasonably high level of skill. One of ordinary skill in the art would possess an advanced degree in pharmacology or several years of experience in designing generic drugs. Such an individual would know of the importance of plasma curves and their value in formulating bioequivalent pharmaceutical compositions. This person would have easily understood the prior art references and have the capacity to draw inferences from them.

### B.    The Scope And Content Of The Prior Art

Relevant prior art includes, but is not limited to: U.S. Pats. Nos. 6,322,819, 6,605,300, and PCT No. PCT/US99/24554 (WO 00/23055). The prior art also includes *Remington The Science And Practice Of Pharmacy* (20th ed. 2000) [hereinafter "*Remington's*"]; and, *Handbook of Pharmaceutical Excipients* (3rd ed. 2000) [herinafter "*Handbook*"]. Moreover, Adderall® XR received FDA approval for marketing on October 11, 2001, and had commercial sales in the United States before the earliest priority date claimed in the '768 patent. *See* Shire's press release "Shire Launches Once A Day Adderall XR", October 29, 2001.[1] Sales of Adderall® XR in the last two quarters of 2001 were $131 million.[2]

### C.    Differences Between The '768 Patent Claims And The Prior Art

There are no differences of any patentable significance between the subject matter of the '768 patent claims and the teachings and/or suggestions of the prior art. Sufficient motivation to combine these references exists because each relates to controlled release dosage forms and/or controlled release dosage forms of mixed amphetamine salts.

---

[1]       http://www.shire.com/shirepharma/uploads/press/shire/Adderall_XR_launch_Final-291001.pdf

[2]       http://nf4.newsfutures.com/bk/market/market.html?_sym=ADAD*4Q4

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 5

## III.    Invalidity Analysis

### A.    The Claims of The '768 Patent Are Invalid As Obvious Under § 103(a)

A court of competent jurisdiction would find the claims of the '768 patent invalid as obvious under § 103(a). As noted, the '768 patent, which the applicants filed on January 29, 2003, claims priority to a provisional application S/N 60/412799 filed September 24, 2002. It does not claim priority from either the '819 or '300 patents, which are listed in the Orange Book for Adderall XR.®

The applicants filed the original application for the '819 on October 21, 1998, which is the date of the earliest claimed priority for the '300 patent. This is long before the FDA approval date for Adderall XR,® or October 11, 2001. The prior art '819 and '300 patents, as well as the earlier WO '055, contain plasma profiles for the Adderall XR® dosage forms.

The '768 patent notes that the sustained release system of the "invention" can include sustained release coatings. Both the '819 and '300 patents, as well as the WO '055 specification disclose sustained release compounds that are admittedly known to the skilled artisan:

> Sustained-release coatings commonly known to one skilled in the art can be used for this purpose by conventional coating techniques such as pan coating or fluid bed coating using solutions of polymers in water or suitable organic solvents or by using aqueous polymer dispersions. For example, the following materials can be used, but not limited to: Cellulose acetate, Cellulose acetate butyrate, Cellulose acetate propionate, Ethyl cellulose, Fatty acids and their esters, Waxes, zein and aqueous polymer dispersions such as EUDRAGIT® RS and RL 30D, EUDRAGIT® NE 30D, AQUACOAT®, SURELEASE®, cellulose acetate latex. The combination of above polymers and hydrophilic polymers such as Hydroxyethyl cellulose, Hydroxypropyl cellulose (KLUCEL®, Hercules Corp.), Hydroxypropyl methylcellulose (METHOCEL®, Dow Chemical Corp.), Polyvinylpyrrolidone can also be used. '300 Pat., Col, 9, lines 6-22.

Furthermore, the '768 patent notes that using these sustained-release compounds in order to match a desired target plasma concentration profile is "conventional." See '768 Pat., Col. 3, line 64 – Col. 4, line 11. The prior art discloses that ethylcellulose functions as a sustained-release coating. For example, ethylcellulose is among the materials that are stated as suitable for producing sustained release coatings. See Remington's at 898; see also Handbook at 195.

The use of such sustained release compounds in a capsulate formulation with amphetamine is not new. For example, Dexedrine® Spansule® capsules, are a sustained release capsule containing dextroamphetamine sulfate for use in the treatment of, inter alia, ADHD. The January 2002 Prescribing Information notes that a product reformulation in 1996 caused a minor change in the color of the time-released pellets within each capsule. Otherwise, the Prescribing Information states that:

> Inactive ingredients now consist of cetyl alcohol, D&C Yellow No. 10, dibutyl sebacate, ethylcellulose, FD&C Blue No. 1, FD&C Blue No. 1 aluminum lake, FD&C Red No. 40, FD&C Yellow No. 6, hydroxypropyl

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion
That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the
Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate,
Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release
Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 6

> methylcellulose, propylene glycol, povidone, silicon dioxide, sodium lauryl
> sulfate, sugar spheres and trace amounts of other inactive ingredients.

Therefore, a sustained release amphetamine product cannot constitute what the '768 patent "inventors"
consider novel.

The purported novelty of the '768 patent "invention" is revealed in the prosecution history, where
the applicants remarked in a Reply submitted November 23, 2004, that:

> **The fact is there was a lack of motivation in the art to employ
> sustained release technology to achieve the recited profile
> features, as already explained of record.** As a result, the sustained
> release components now recited in the claims clearly reflect the
> patentability of employing sustained release technology to achieve the
> particular release profile or features of the claims. None of the
> references disclose these specific sustained release formulation
> components for the achievement of the plasma profile features recited in
> the claims, nor do they suggest the same. Reply, November 23, 2004 at
> 17 (emphasis added).

The applicants provided no declarations nor did they otherwise refer to any unexpected results from the
sustained release formulations of the '768 patent "invention."

The skilled artisan would know of the importance of plasma curves and their value in formulating
bioequivalent pharmaceutical compositions. This individual would know that a manufacturer seeking
approval to market a generic drug must submit data demonstrating that the drug product is bioequivalent
to the innovator drug product.

> Bioequivalence of different formulations of the same drug substance
> involves equivalence with respect to the rate and extent of drug
> absorption. Two formulations whose rate and extent of absorption differ
> by −20%/+25% or less are generally considered bioequivalent. The use
> of the −20%/+25% rule is based on a medical decision that for most
> drugs, a −20%/+25% difference in the concentration of the active
> ingredient in blood will not be clinically significant. *Remington's* at 1000.

It is clear that the intention of the '768 patentees is to achieve bioequivalency between the
sustained release formulation of the "invention" and Adderall XR®, which uses a pulsatile release of
amphetamine. The '768 patent notes that:

> [p]articularly preferably, the SR formulations according to the
> invention exhibit a single dose in vivo plasma concentration profile
> substantially the same as that shown in FIG. 1. The latter shows the
> substantially smooth mean (over about 20 patients) plasma
> concentration curves achieved for both the dextroamphetamine and
> levoamphetamine salts in ADDERALL XR®. (The overall mean plasma
> concentration curve for total amphetamine level is simply the sum of the
> two curves shown in FIG. 1). '768 Pat., Col. 1, lines 29-37.

The '768 patent further states that:

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 7

> [b]y substantially the same "profile" herein is meant that two curves
> have substantially the same AUC (are under the curve) and Cmax, e.g.,
> these parameters for each curve are ±20% of each other, or even
> closer, eg ±10%, ±5%, ±2%, etc., which parameters are entirely
> conventionally defined and determined. *Id.* at lines 42-47.

Moreover, the '768 patent discloses:

> Details of using the foregoing constructs and others to achieve a
> desired plasma profile as discussed above are fully conventional and can
> be determined by those of skill in the art with at most a few routine
> parametric experiments, and conventional adjustments, e.g., involving
> identities of polymers and mixtures thereof, relative amounts of
> components, coating thicknesses, bead diameters, number of layers and
> compositions thereof, etc. Thus, for example, for a given construct
> (e.g., one of those in the examples herein), dissolution profiles can be
> determined and in vivo plasma profiles measured. The latter can
> then conventionally be compared to the target plasma profile (e.g., that
> of ADDERALL XR® and differences compensated by fully conventional
> formulation and dissolution profile adjustments such as but not limited to
> those mentioned. *Id.* at Col. 3, line 64 – Col. 4, line 11.

Thus, what the '768 patent teaches and attempts to claim as an "invention" is what generic manufacturers do with regularity, *i.e.,* design a bioequivalent product that provides the same "profile" as the innovator product, within –20%/+25%. A generic manufacturer would use the known plasma profile for Adderall XR® and design a sustained release formulation to achieve it. This is routine as admitted by the '768 patentees. The '768 patentees discuss a few sustained release systems one might employ in the invention, and then note that "[m]atching to the desired target plasma concentration profile using SR is conventional." '768 Pat., Col. 3, lines 2-4. Using the admittedly conventional techniques to arrive at a sustained release mixed amphetamine formulation would not entail any undue experimentation.

The '768 patentees note that

> [i]n one embodiment, the fast sustained release formulations of this
> invention are used to provide a mean plasma concentration profile
> substantially the same as that of Example 5 (combination of Examples 1
> and 2) of WO 00/23055, **despite the latter's disclosure that
> conventional sustained release formulation technology was not
> suitable for amphetamines**. *Id.,* Col. 2, lines 19-25 (emphasis
> added).

A careful reading of the WO '055 – which is the counterpart to the '300 patent – reveals that this is not actually what the WO '055 says.

The WO '055 notes that for "certain drugs" sustained release delivery is not suitable and is affected by a number of factors, such as first pass metabolism, biological tolerance, chronopharmacology and circadian rhythms, local therapeutic need, gastric irritation or drug instability in gastric fluid and drug absorption differences in various gastrointestinal segments. *See* WO '055 at 1-2. The WO '055 does *not* state that sustained release formulation technology does not work with amphetamines.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion
That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the
Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate,
Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release
Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 8

The WO '055 specification explains that "pulsed" dose delivery systems, prepared either as single or multiple unit formulations that are capable of releasing the drug after a predetermined time, "have been studied to address the aforementioned problematic areas for sustained release preparations." *Id.* at 2. Notwithstanding this study, "[t]hese same factors are also problematic in pulsed dose formulation development." *Id.*

A more accurate description of what the WO '055 discloses is from the "Summary Of The Invention," which states:

> Accordingly, in view of a need for successfully administering a multiple unit pulsed dose of amphetamine salts and mixtures thereof, **the present invention provides an oral multiple unit pulsed dose delivery system for amphetamine salts and mixtures thereof.** Figure 1 illustrates the desired target plasma level profile of the pharmaceutical active contained within the delivery system. *Id.* at 4 (emphasis added).

Contrary to what the '768 patent specification asserts and as noted above, the WO '055 does not expressly state that conventional sustained release formulation technology is not suitable for amphetamines. In view of the WO '055 specification, one is more inclined to say that conventional sustained release formulation technology would not provide for the "pulsed" delivery system in the WO '055. Consequently, while one might not use a conventional sustained release formulation in an effort to achieve a "pulsed" delivery system, this would not dissuade one from using a sustained release delivery system to formulate a composition that achieves the same AUC and $C_{max}$ necessary to obtain bioequivalence.

As mentioned, the '768 patentees simply argued during prosecution that no motivation existed to employ sustained release technology to achieve the profile features of Adderall XR®. However, ample motivation existed to encourage one of ordinary skill in the art to use sustained release technology. The prior art does not teach away from using sustained release formulations with amphetamines. Moreover, one of ordinary skill in the art would clearly have a motivation to design-around the claims of the '819 and '300 patents, which are listed in the FDA's Orange Book and purportedly teach the pulsatile formulation used in Adderall XR®.

What provides motivation to use sustain released formulations in developing a dosage form with a profile like Adderall XR®, is the fact that the '819 and '300 patentees distinguish between pulsatile and sustained release formulations. One seeking to avoid the '819 and '300 patent claims would, therefore, have a motivation to use a sustained release formulation, which the '819 and '300 patentees note is *not* the pulsatile formulation of those patents. This is precisely what generic manufacturers do to avoid patent infringement.

The FDA approved the 20 mg Adderall XR® October 11, 2001. With the availability of the mixed amphetamine capsule, one of ordinary skill in the art could easily determine the dissolution profile of Adderall XR® in order to design a sustained release formulation. One of ordinary skill in the art would know that matching the criteria from a sustained release formulation with the plasma concentration versus time curve for Adderall XR® would demonstrate bioequivalence. Furthermore, the methodology for showing bioequivalence is well known to the skilled artisan. *See e.g. Remington's* at 995-1001.

In addition, the skilled artisan would have a reasonable expectation that one could make a sustained release formulation that would yield a bioequivalent product with a plasma curve such as Fig 1 of the '768 patent. This is because the prior art WO '055 would lead one to use a sustained release

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for Its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 9

formulation. The WO '055 does not say that one cannot use a sustained release formulation with amphetamine. On the contrary, the WO '055 says that the problems encountered with a sustained release formulation are the same as those encountered with the pulsatile product. Even the '768 patentees state that matching to a desired target plasma concentration profile using sustained release is conventional in the art. *See* '768 Pat., Col. 3, lines 2–4.

      **1.**      **The Claims The '768 Patent Are Invalid As Obvious**

      "Obviousness does not require absolute predictability of success. . . . For obviousness under § 103, all that is required is a reasonable expectation of success. *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988) (citations omitted). Based upon the prior art, one of ordinary skill in the art would have found independent claim 1 of the '768 patent obvious. This claim is directed to, *inter alia*, a composition comprising mixtures of d- and l-amphetamines with a sustained release coating that provides a mean plasma concentration profile such as that in Fig 1. As noted above, the possibilities enumerated for the sustained release coating are already within the prior art – in fact, the coatings are disclosed as sustained release coatings in the '819 and '300 patents. Moreover, one of ordinary skill would know that in order to achieve bioequivalence, one would try to achieve a plasma profile that is equivalent to that for Adderall XR®.

      The claims depending from claim 1, *i.e.*, claims 2-6, 16 and 18 do not impart anything that renders the claims unobvious. Claim 2 simply defines the amphetamine mixture as the salts that are already in Adderall XR®.[3] Claim 3 requires that the amphetamine salts are in equal weight in the composition. Both of these conditions are within the prior art Adderall XR® compositions. The skilled artisan would find using the same salts in the same weights to achieve a bioequivalent mixed amphetamine product obvious in view of the prior art.

      Claim 4 is directed to a composition where the amphetamine salt is provided in a core coated with a water-insoluble film former or other polymer providing sustained release. These characteristics for a sustained release coating are already within the prior art '819 and '300 patents. Claim 5 has the further limitation that the coating comprises a "dissolution regulating agent." This term is not defined in the '768 patent specification, but could mean an agent that provides for sustained release.[4] If so, the term could encompass a sustained release compound such as ethylcellulose. Under this interpretation, claim 5 is also obvious for the same reasons as expressed for claim 4.

      Claim 16 is directed to a sustained release matrix composition. There are a number of sustained release matrix compositions in the prior art, so making a matrix for sustained release does not otherwise render claim 16 unobvious.

      Dependent claim 18 is directed to treating ADHD by administering the composition of claim 17. Claim 17 depends from claim 16, but includes the further limitation that the sustained release matrix comprises ethylcellulose. One of ordinary skill would know that using ethylcellulose would impart sustained release characteristics, for the reasons expressed above. The treatment of ADHD using a sustained release amphetamine is well-known in the art as demonstrated by Dexedrine® Spansule® capsules. The skilled artisan would, therefore, have a reasonable expectation that the use of a sustained

---

[3]     Similar arguments attach to claims 19 and 36, which are directed to a mixture of d- and l-amphetamine salts. Claims 19 and 36 are obvious for the reasons expressed for claim 2.

[4]     If a "dissolution regulating agent" has another specialized meaning, then claim 5 is indefinite under § 112, second paragraph.

914805-1                                         9

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate, Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules**
Page 10

released mixed amphetamine with an ethylcellulose matrix would successfully treat ADHD. In similar fashion, the skilled artisan would find it obvious to administer the composition of claim 1 for the treatment of ADHD as recited in claim 6 of the '768 patent.

Independent claim 7 is directed to a sustained release composition that provides a mean plasma concentration profile with "substantially" the same initial slope as the curves in Fig. 1. As explained above, one of ordinary skill in the art would know of the prior art Adderall XR® plasma concentration curves. Matching the plasma concentration curves is what generic manufacturers attempt to achieve to demonstrate bioequivalence to the FDA. Thus, one of ordinary skill in the art would have the motivation to match the plasma curves of Adderall XR® when designing a sustained release product. Claim 7 simply provides details of the plasma curve that the skilled artisan would already have the motivation to match with a sustained release product.

Likewise, claims 9 and 11 provide the plasma concentration figures from the plasma concentration curve. For the reasons expressed above, one of ordinary skill in the art would have the motivation to match plasma curves as closely as possible with Adderall XR® in order to demonstrate bioequivalence. Nothing about the formulations of these claims indicates that the sustained release imparts anything unobvious.

Claims 8 and 10 are directed to the use of the formulations of claims 7 and 9 in the treatment of ADHD. The use of the sustained release compositions for the treatment of ADHD is obvious. Claim 12 is directed to a sustained release composition that provides a mean plasma profile with certain AUC and $C_{max}$ values. One of ordinary skill in the art would have the motivation to use these known values for Adderall XR® in order to establish bioequivalence with the FDA. Thus, the skilled artisan using the admittedly conventional techniques of sustained release technology, could design a formulation that would reflect the AUC and $C_{max}$ values for Adderall XR®. Similar arguments apply to claims 14, 15 and 35 of the '768 patent.

Claim 13 is directed to the use of a sustained release composition that provides a mean plasma profile with certain AUC and $C_{max}$ values. For the reasons expressed above for claim 12, however, one of ordinary skill in the art would find it obvious to use the composition to treat ADHD.

Claim 25 is directed to compositions that have a first order dissolution profile. Claim 26 is directed to the composition of claim 25 where the release profile is determined in a dissolution profile test. Providing a sustained release formulation with a first order dissolution profile does not otherwise render claim 25 unobvious. As the '768 patents note, matching a sustained release formulation to a target plasma profile is conventional in the art. In addition, claim 26 is directed to a determination of a first order dissolution profile. One of ordinary skill in the art would find it obvious to use a dissolution profile test to ascertain a dissolution profile of a pharmaceutical composition.[5]

Dependent claims 20-24, 27-32 and 37 are directed to sustained release coatings employed in the sustained release formulations. None of the recitations in these claims would render them otherwise unobvious to one of ordinary skill in the art. Dependent claims 33-34 recite that the numerical value range recited in claims 9, 11-15 or 22 is achieved for either levoamphetamine or dextro- and levoamphetamine, respectively. For the reasons expressed above, one of ordinary skill in the art would find these claims obvious.

---

[5]    The parameters for determining the dissolution profile are not specified in the '768 patent. To the extent that such a determination is dependent upon particular parameters not elucidated by the '768 patentees, then claim 26 is indefinite under § 112, second paragraph.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases for its Opinion
That U.S. Patent No. 6,913,768 Is Invalid, Unenforceable or Not Infringed by the
Manufacture, Use or Sale of Impax's Amphetamine Aspartate, Amphetamine Sulfate,
Dextroamphetamine Saccharate And Dextroamphetamine Sulfate Extended Release
Capsules, 5, 10, 15, 20, 25 And 30 mg Extended Release Capsules
Page 11

## B.    Secondary Considerations

When present a court must consider any objective indicia of nonobviousness, which may often constitute the most probative evidence in the record. *Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309, 315 (Fed. Cir. 1985). A nexus is required between the merits of the claimed invention and any evidence of secondary consideration. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed. Cir. 1983). The objective indicia or "secondary considerations" of nonobviousness, however, do not control the analysis when there is an otherwise strong case of obviousness, such as one based upon art not considered by the Patent Office during prosecution. *Newell Cos., Inc. v. Kenny Mfg. Co.,* 864 F.2d 757, 768-69 (Fed. Cir. 1988).

Common secondary considerations are: (1) commercial success; (2) solution of a longstanding problem (long-felt need); (3) failure of others; (4) widespread recognition; (5) copying; and (6) disbelief by experts that the invention would work for its intended purpose. *Stratoflex, Inc.,* 713 F.2d at 1538.

The prosecution history is bereft of any mention of unexpected results achieved with the "invention" of the '768 patent. Impax is unaware of any secondary indicia of non-obviousness asserted or relied upon by the patentees during prosecution. Nor is Impax aware of any evidence that points to any long-felt need for a sustained release mixed amphetamine product. Moreover, there is no indication or assertion -- other than the '768 patentees' expression of doubt during prosecution of the '768 patent application -- that a sustained release formulation of mixed amphetamine salts could not provide a bioequivalent form of Adderall XR®. There is no apparent widespread recognition in the industry of the merits of the claimed "invention." Nor is there any apparent disbelief by experts that the claimed "invention" would work for its intended purpose.

Further, there is no evidence that others could not solve the problem that the '768 patentees purportedly solved. Contrary to the comments by the '768 patentees, the prior art does not teach that conventional sustained release formulation technology is not suitable for amphetamines. Thus, the prior art does not teach away from the purported invention of the '768 patent. Commercial success is not a viable consideration in this case since to Impax's knowledge there is no commercial product that is covered by the '768 patent.

Rather, as is shown above the prior art clearly suggests an appreciation that a sustained release mixed amphetamine salt dosage form would work for its intended purpose. As a consequence, no secondary considerations overcome the otherwise strong case of obviousness that exists in connection with the '768 patent claims.

## IV.    Conclusion

For the reasons stated above, all claims of U.S. Pat. No. 6,913,768 are invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax's capsules. Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of this U.S. Patent are invalid, unenforceable, or not infringed.

### ABBREVIATED NEW DRUG APPLICATION 76-852
### OFFER OF CONFIDENTIAL ACCESS
### PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

WHEREAS Impax Laboratories, Inc. ("Impax") has provided notice to Shire Laboratories, Inc. (hereinafter "Recipient"), that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application 76-852 for 5, 10, 15, 20, 25 and 30 mg mixed amphetamine capsules (referred to hereinafter in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 6,913,768 (the "Listed Patent"), which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations"; and

WHEREAS this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III) which provides:

> The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;
>
> and

WHEREAS Impax desires to offer to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

WHEREAS this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

NOW, THEREFORE:

1.    Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions contained in Section 2 below, Impax hereby provides Recipient this Offer of Confidential

Access ("Offer") for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.      This Offer is subject to the following restrictions as to persons entitled to access and the use and disposition of any information accessed:

      **A.**    **Persons Entitled to Access:**  Persons entitled to access ("Authorized Evaluators") under this Offer of Confidential Access are restricted to:  (i) outside counsel engaged or employed by Recipient to represent them and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that such outside counsel has been identified to Impax in writing; (ii) no more than two (2) in-house counsel and the staff of such in-house counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel; and (iii) independent consultants and experts assisting in the evaluation of possible infringement of the Listed Patent and any employees and assistants under the control of such consultant or expert.

      **B.**    **Materials Accessible by Authorized Evaluators:**  A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

      **C.**    **Use of the ANDA and Information in the ANDA:**

          (1)  The ANDA and all information contained therein or derived therefrom may be used for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

          (2)  Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than person entitled to access under subsection A.

          (3)  Notwithstanding the provisions of subsections 2(C)(1) and 2(C)(2) above, Authorized Evaluators shall be permitted to advise Recipient whether or not to bring suit alleging infringement of the Listed Patent; provided, however, that the information in the ANDA is not thereby disclosed.

      **D.**    **Disposition of the Information in the ANDA:**

          (1)  Recipient agrees that if they do not file suit against Impax alleging infringement of the Listed Patent within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period"), which this offer accompanies, Recipient shall cause Authorized Evaluators within thirty (30) days after the expiration of the 45-day period, to destroy or return to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, and Recipient shall notify Impax that this has been done.

(2) Recipient agrees that if any Recipient files suit against Impax alleging infringement of the Listed Patent within the 45-day period:

(a) While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax. Until such a protective order is entered, subsection 2(C)(2) above continues to apply.

(b) Recipients shall cause Authorized Evaluators to destroy or return to Impax the portions of the ANDA provided and all notes, analyses, studies or other documents prepared to the extent that they contain information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

(3) Notwithstanding the provisions of subsections 2(D)(1) and 2(D)(2) above, each outside law firm authorized to have access pursuant to subsection 2(A)(i) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document to the extent that they contain information in the ANDA.

E. **Accidental Disclosure:** Should information contained in the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at their earliest opportunity, by and through Authorized Evaluators, contact Impax and identify:

(1) what has been disclosed;

(2) the individuals to whom such information has been disclosed; and

(3) steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA is not further disseminated.

3.      Recipient acknowledges that violation of any provision of this Offer will cause irreparable injury to Impax, and that an adequate legal remedy does not exist. Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient from violating the terms of this Offer. Recipient agrees that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

4.      Should any provision set forth in this Offer be found by a court of competent jurisdiction to be illegal, unconstitutional or unenforceable, the remaining provisions shall continue in full force and effect.

5.      Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA except for the purpose expressly stated herein.

914804-1

6.    When accepted by Recipient, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

7.    Recipient may request access to the ANDA by executing one copy of this Offer where indicated and returning the executed copy to Meg Snowden, Esq., c/o Impax Laboratories, Inc., within the 45-day period. Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.
By its authorized agent:

_____

Date: _July 5, 2005_____

Recipient
By its authorized agent:

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____

914804-1